# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

TREVON WILEY                                                     CIVIL ACTION

VERSUS                                                                 NO. 16-3408

BURL CAIN, WARDEN                                        SECTION: "H"(1)

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Trevon Wiley, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.  On August 19, 2009, he was convicted of second degree murder and aggravated burglary under Louisiana law.[1]  On August 31, 2009, he was sentenced on the murder conviction to a term of life imprisonment, without benefit of parole, probation, or suspension of sentence, and on the burglary conviction to a concurrent term of thirty years imprisonment.[2]  On

---

[1] State Rec., Vol. 5 of 5, transcript of August 19, 2009, p. 42; State Rec., Vol. 3 of 5, minute entry dated August 19, 2009; State Rec., Vol. 3 of 5, jury verdict form.
[2] State Rec., Vol. 5 of 5, transcript of August 31, 2009; State Rec., Vol. 3 of 5, minute entry dated August 31, 2009.

April 26, 2011, the Louisiana Fifth Circuit Court of Appeal affirmed his convictions and sentences.[3]  Without assigning reasons, the Louisiana Supreme Court then denied his related writ application on March 30, 2012.[4]

On or after April 25, 2013, petitioner filed an application for post-conviction relief with the state district court.[5]  That application was denied on October 29, 2013,[6] and May 19, 2014.[7] The Louisiana Fifth Circuit Court of Appeal likewise denied relief on November 5, 2014,[8] and the Louisiana Supreme Court then rejected petitioner's related writ application as untimely filed on April 4, 2016.[9]

In the interim, on March 24, 2014, petitioner supplemented his post-conviction application in the state district court to add four additional claims.[10]  At the time the instant federal application was filed, those supplemental claims were still pending before the state district court.[11]

---

[3] State v. Wiley, 68 So. 3d 583 (La. App. 5th Cir. Apr. 26, 2011); State Rec., Vol. 1 of 5.  However, the Court of Appeal noted that "the district court must amend the commitment to delete the flat time restriction that the trial judge placed on the defendant's sentence for aggravated burglary." Id. at 593.

[4] State ex rel. Wiley v. State, 85 So. 3d 106 (La. 2012); State Rec., Vol. 1 of 5.

[5] State Rec., Vol. 1 of 5.  Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006).  That date cannot be gleaned from the state court record with respect to this filing.  However, in that the cover letter and memorandum accompanying the application were dated April 25, 2013, that application packet obviously was not placed in the prison mail system any earlier than that date.

[6] State Rec., Vol. 1 of 5, Order dated October 29, 2013.

[7] State Rec., Vol. 2 of 5, Order dated May 19, 2014; State Rec., Vol. 2 of 5, transcript of May 19, 2014.

[8] Wiley v. Cain, No. 14-KH-580 (La. App. 5th Cir. Nov. 5, 2014); Rec. Doc. 4-6, pp. 56-58.  The Court of Appeal likewise denied petitioner's request for rehearing.  Rec. Doc. 4-6, pp. 67-68.

[9] State ex rel. Wiley v. State, 188 So.3d 1028 (La. 2016); Rec. Doc. 4, pp. 4-5.

[10] State Rec., Vol. 2 of 5.  The certificate of service accompanying the supplemental application was dated March 24, 2014.

[11] See Rec. Doc. 4-1, p. 2; Rec. Doc. 9, p. 8.  Petitioner suggests that this case should be stayed while he exhausts his state court remedies with respect to the supplemental claims.  However, because petitioner's federal application is untimely for the reasons explained herein, a stay is not warranted.  See, e.g., Smallwood v. Cain, Civ. Action No. 12-2812, 2013 WL 5757663, at *6 (E.D. La. Oct. 23, 2013) (Milazzo, J.) ("Smallwood's federal petition is not timely filed …. A stay would be unnecessary and unduly burdensome on the Court and the respondent where the underlying petition is already untimely and any delay in his return would not cure that concern."); Nellon v. Cain, Civ. Action No. 10-4430, 2012 WL 1142539, at *3 (E.D. La. Jan. 25, 2012) ("Clearly, claims submitted in an untimely federal application cannot serve as a basis for relief and, therefore, qualify as 'plainly meritless.'  Accordingly, if petitioner's

On or after April 14, 2016, petitioner filed the instant federal application seeking habeas corpus relief.[12]  The state filed a response arguing, *inter alia*, that petitioner's federal application is untimely.[13]  The state is correct.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final."  28 U.S.C. § 2244(d)(1)(A).[14]  On that point, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court.  Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).  *However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires."*  Id. at 694; see also Foreman v. Dretke, 383 F.3d 336, 338 (5th Cir. 2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).
>
> *Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review.  See Foreman, 383 F.3d at 338-39.  As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal.  See Causey v. Cain, 450 F.3d 601, 606 (5th Cir. 2006); Roberts, 319 F.3d at 693.  Louisiana Supreme Court Rule X, § 5(a) states that an application "to review a judgment of the court of appeal either after an appeal to that court ... or after a denial of an application, shall be made within*

---

protective federal application was already untimely when filed, a stay is not warranted."), adopted, 2012 WL 1089232 (E.D. La. Mar. 30, 2012).

[12] Rec. Doc. 4.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Petitioner's application was signed on April 14, 2016, and, therefore, that is the earliest date it could have been placed in the prison mail system.

[13] Rec. Doc. 9.

[14] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

> *thirty days of the mailing of the notice of the original judgment of the court of appeal.*"

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008) (emphasis added).

On April 26, 2011, the Louisiana Fifth Circuit Court of Appeal affirmed petitioner's convictions and sentences and mailed him notice of its judgment on that same date.[15] As noted, petitioner then had only thirty days (i.e. until May 26, 2011) to file a writ application with the Louisiana Supreme Court to challenge that judgment. The central issue in the instant case is whether petitioner's related direct-review writ application in Louisiana Supreme Court Case No. 2011-KH-1263 was filed on or before May 26, 2011.

In its response, the state contends that petitioner's writ application was not filed on or before that deadline.[16] Petitioner has not alleged, much less submitted evidence to prove, otherwise. Moreover, the Court notes that he apparently keeps meticulous records concerning his mailings, in that he supplied numerous institutional mailing slips to establish the dates of various *other* filings.[17] Nevertheless, such evidence with respect to this Louisiana Supreme Court writ application is conspicuously absent from his application to this Court.

The only evidence in the record concerning the timing of the filing of the writ application in Case No. 2011-KH-1263 is a letter to petitioner from the Clerk of the Court of the Louisiana Supreme Court. In pertinent part, that letter stated: "This is to advise that the pleadings in the above titled matter were received and filed on 6/16/2011. The filing was post marked on June 14,

---

[15] Rec. Doc. 4-2, p. 71, Notice of Judgment and Certificate of Mailing.

[16] Rec. Doc. 9, pp. 7-8 and 16-17.

[17] See, e.g., Rec. Doc. 4, pp. 9, 14-15, and 17; Rec. Doc. 4-3, p. 39; Rec. Doc. 4-4, pp. 58 and 73; Rec. Doc. 4-5, p. 24; Rec. Doc. 4-7, pp. 19-20, 30-35, 37-38, and 70; Rec. Doc. 4-8, p. 10, 16-18, 32, and 50; Rec. Doc. 4-9, pp. 28-31, 34, 39, 50-51, and 64.

2011."[18]  Because both of those referenced dates are after May 26, 2011, that letter cannot serve as proof that the application was timely filed.  However, although the letter would suggest that the application was untimely, it is not definitive proof of that fact.  Under Louisiana's "mailbox rule," the "filing date" of a prisoner filing is neither the postmark date nor the receipt date; rather, it is the date the prisoner "placed [his application] in the prison mail system."  Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006).

Because the record was devoid of evidence as to when that occurred in the instant case, the Court, out of an abundance of caution, contacted the Warden of the Louisiana State Penitentiary to ascertain whether the prison possessed any records which would show that petitioner submitted his Louisiana Supreme Court writ application to prison officials for mailing on or before the filing deadline.[19]  However, the prison had no records showing any submission from petitioner between the date of the Court of Appeal's decision (April 26, 2011) and the Louisiana Supreme Court filing deadline (May 26, 2011).[20]

In summary, petitioner has submitted no evidence indicating the Louisiana Supreme Court writ application was timely filed, the prison has no such evidence, and the only evidence in the record suggests that the writ application was untimely.  In light of those facts, and because the Louisiana Supreme Court's failure to assign reasons in denying relief cannot be interpreted as an indication that it found the application timely, see Butler, 533 F.3d at 318-19,[21] this Court simply has no basis for concluding that the Louisiana Supreme Court writ application was timely filed.

---

[18] State Rec., Vol. 1 of 5, Letter to petitioner from Clerk of Court dated June 16, 2011.
[19] Rec. Doc. 12.
[20] Rec. Doc. 13.
[21] See also Richardson v. Cain, 628 Fed. App'x 304 , 305 (5th Cir. 2016).

In light of the foregoing, the Court finds that petitioner's conviction became final on May 26, 2011, i.e. when his deadline for seeking further direct review expired. His federal limitations period therefore commenced on that date and then expired one year later on May 29, 2012,[22] unless that federal deadline was extended through tolling.

The Court first considers statutory tolling. The AEDPA provides that the statute of limitations is tolled for the period of time during which a properly filed application for state *post-conviction relief or other collateral review* attacking a conviction or sentence is pending in state court. 28 U.S.C. § 2244(d)(2). During his one-year limitations period, petitioner filed only *one* application in the Louisiana state courts -- his untimely *direct-review* Louisiana Supreme Court writ application in Case No. 2011-KH-1263. However, because that application was seeking further *direct review* (albeit in an untimely manner), § 2244(d)(2) simply does not apply. The United States Fifth Circuit Court of Appeals has expressly and conclusively held that a petitioner is not entitled to *any* tolling credit under § 2244(d)(2) for an untimely *direct-review* filing.

Specifically, the Fifth Circuit explained: "Under [§ 2244(d)(2)] it is only state *post-conviction relief proceedings* that cause tolling." Butler, 533 F.3d at 318 (emphasis added). Accordingly, an untimely *direct-review* writ application, such as the one in the instant case, does *not* toll the federal limitations period. See id. at 320 ("Filings that are not part of habeas or post-conviction proceedings do not invoke Section 2244(d)(2) tolling. … The only document Butler filed related to his untimely direct review application was the application itself, which is

---

[22] Because May 26-27, 2012 fell on a weekend, and because May 28, 2011 was a federal holiday (Memorial Day), the federal limitations period was extended through the following Tuesday, May 29, 2012. See Flanagan v. Johnson, 154 F.3d 196, 202 (5th Cir. 1998) ("We hold that [Fed.R.Civ.P.] 6(a) applies to the computation of the one year limitation period in § 2244(d) of AEDPA."); Fed.R.Civ.P. 6(a) (if the last day of an applicable period is a Saturday, a Sunday, a legal holiday, or a day when the clerk's office is inaccessible, the period runs until the end of the next day that is not one of those days).

indisputably a part of his direct appeal proceedings."); <u>Allen v. Tanner</u>, Civ. Action Nos. 11-927 and 11-1601, 2011 WL 4344586, at *2 (E.D. La. Aug. 19, 2011), <u>adopted</u>, 2011 WL 4345081 (E.D. La. Sept. 15, 2011).

Therefore, simply put: because the writ application in Case No. 2011-KH-1263 sought *direct review*, and because petitioner filed no state applications seeking *post-conviction relief or other collateral review* on or before May 29, 2012, he is not entitled to *statutory* tolling under § 2244(d)(2).[23]

The Court must next consider *equitable* tolling. The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling. <u>Holland v. Florida</u>, 560 U.S. 631, 645 (2010). However, "a petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." <u>Id</u>. at 649 (internal quotation marks omitted); <u>accord</u> <u>Davis v. Johnson</u>, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances"). A petitioner bears the burden of proof to establish entitlement to equitable tolling. <u>Alexander v. Cockrell</u>, 294 F.3d 626, 629 (5th Cir. 2002). In the instant case, petitioner has brought forth no evidence demonstrating that he is entitled to such tolling, and this Court knows of no reason that would support equitable tolling of the statute of limitations.

---

[23] Although petitioner *subsequently* sought post-conviction relief in the state courts, applications filed after the expiration of the federal statute of limitations have no bearing on § 2244(d)(2) tolling determinations. <u>See</u> <u>Scott v. Johnson</u>, 227 F.3d 260, 263 (5th Cir. 2000); <u>Magee v. Cain</u>, Civ. Action No. 99-3867, 2000 WL 1023423, at *4 (E.D. La. July 24, 2000), <u>aff'd</u>, 253 F.3d 702 (5th Cir. 2001); <u>Williams v. Cain</u>, Civ. Action No. 00-536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000). Once the federal limitations period has expired, "[t]here [i]s nothing to toll." <u>Butler v. Cain</u>, 533 F.3d 314, 318 (5th Cir. 2008).

Lastly, the Court also notes that the United States Supreme Court has held: "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... or, as in this case, expiration of the statute of limitations." McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013). Petitioner has not invoked McQuiggin. However, in the event he does so in any objections to this Report and Recommendation, the undersigned finds that petitioner has not made the showing required under McQuiggin for the following reasons.

In McQuiggin, the Supreme Court expressly cautioned: "[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" McQuiggin, 133 S. Ct. at 1928 (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)). Further, as the United States Sixth Circuit Court of Appeals has explained:

> To assess that question, a court must survey "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." House v. Bell, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) (internal quotation marks omitted). With "all the evidence" thus in mind, the court's final task is "to assess the likely impact of the evidence on reasonable jurors"; it is not to work through an "independent factual determination" to divine "what likely occurred." Id. (internal quotation marks omitted).

Eberle v. Warden, Mansfield Correctional Institution, 532 Fed. App'x 605, 613 (6th Cir. 2013); accord Johnson v. Cain, Civ. Action No. 14-543, 2015 WL 4528889, at *2-3 (E.D. La. July 27, 2015), aff'd, 667 Fed. App'x 474 (5th Cir. 2016), cert. denied, 137 S. Ct. 1105 (2017); Lyles v. Tanner, Civ. Action No. 13-655, 2014 WL 4674673, at *6 (E.D. La. Sept. 17, 2014).

A logical starting point, therefore, is to look at the "old" evidence, i.e. the evidence presented at trial and on which petitioner's convictions were based.  See, e.g., Johnson, 2015 WL 4528889, at *3; Lyles, 2014 WL 4674673, at *6.  Here, that evidence was recounted in the Louisiana Fifth Circuit Court of Appeal's summary of the facts of this case on direct appeal:

> Captain Dennis Thornton of the Jefferson Parish Sheriff's Office testified he was senior supervisor at the crime scene on July 18, 2007 at 2328 Sauvage Avenue in Marrero.  He conducted the crime scene investigation, observing various items of evidence throughout the house and making a sketch of the scene.  The victim, Louis Perreira, was already deceased when Thornton arrived at the crime scene.  Thornton observed that the victim had a gunshot wound to the left side of his head.  The victim was on a bed and appeared to have been shot where he was lying.  Captain Thornton testified he made an evidence list from the scene of the crime, which included a piece of chewing gum pushed into the peephole on the front door.  Thornton recovered the piece of gum immediately out of concern the gum would fall off the peephole, because he believed the gum had been freshly-chewed before being affixed to the door.  He wanted to recover DNA and/or fingerprint evidence from the gum.  Thornton also recovered firearms from the scene and took numerous photographs, including pictures of the living room, the exterior of 2328 Sauvage, and the hallway heading to the back bedroom where the victim's body was found.
>
> Jason Barrette, a former Jefferson Parish Sheriff's Office deputy, testified he investigated this matter.[FN 3]  Barrette said that within a week of Louis Perreira's death, Aaron Sennette and Christopher Sennette were arrested.[FN 4]  Rickey Taylor, Eric Brown, and Trevon Wiley (the defendant) were arrested several weeks later.
>
> > [FN 3]  Barrette resigned from the Sheriff's Office after his arrest on drug charges. …
> >
> > [FN 4]  The Sennettes are brothers.  Aaron Sennette was later released.
>
> Barrette took a statement from Rickey Taylor, in which Taylor stated that Brown and the defendant took part in killing Louis Perreira.  According to Taylor, while he was staying at the Sennette residence listening to music and using his computer, Trevon Wiley told him that he wanted to "jack" or rob somebody.  Taylor then fell asleep.  When Taylor woke up, he went outside to smoke a cigarette and noticed several police cars with their lights on outside the Perreira residence.[FN 5]  Taylor told Barrette that he later asked the defendant if he robbed and killed Louis Perreira, to which the defendant replied "Yes."  Taylor said he learned from

Brown that the defendant was the "triggerman," that is, the person who actually killed the victim.

> [FN 5]  The Sennette residence is on Glasco Drive, about half-a-block from the Perreira residence.

Barrette took a statement from Brown, in which Brown said that he was stationed as a lookout and that the defendant, Taylor, and Christopher Sennette broke into the Perreira residence through the front door. According to Brown, while he was stationed as a lookout he heard a pop and observed the defendant, Taylor, and Christopher Sennette run out of the Perreira residence. Barrette also took a statement from Ronnisha Johnson, who was the defendant's girlfriend at the time.

Dr. Susan Garcia, accepted as an expert in forensic pathology, testified she performed an autopsy on Louis Perreira. Dr. Garcia testified that the victim sustained an intermediate-range gunshot wound from an approximate distance of one to three feet to the left side of his head, which was the cause of his death. Dr. Garcia said he had no other injuries to his body other than the entrance wound to his head.

Chad Pitfield of the Jefferson Parish Sheriff's Office crime laboratory, an expert in latent fingerprint identification, testified he examined the piece of gum that was jammed into the front door's peephole. Pitfield said he found a latent print on the piece of gum. He analyzed the latent print and concluded it was made by the right index finger of Trevon Wiley, the defendant.

Detective Arthur Thibodeaux of the Jefferson Parish Sheriff's Office testified he assisted Detective Barrette in a search for the murder weapon at 3136 Sweet Gum Drive in Harvey, the home of Ronnisha Johnson. Detectives Thibodeaux and Barrette proceeded to the location, where they spoke to Ronnisha Johnson's father. He agreed to cooperate and allowed the detectives to search for a weapon. The search of the residence produced a .38 caliber snub-nose revolver hidden inside a shoe in a closet. The revolver was a five-shot pistol, which had two bullets in the cylinder when Thibodeaux recovered it.

Mike Perreira, the victim's son, testified that he learned of his father's murder through a phone call from his mother. Mike arrived at the 2328 Sauvage residence shortly thereafter, but police would not permit him to enter the home right away. Later in the evening, police allowed Mike to enter the residence to see if anything was missing. He noticed that one of his father's shotguns, his father's cellular phone, and his father's wallet were missing. Mike explained that Perreira had a prepaid cellular phone and that when he needed more prepaid minutes, he would purchase them from a convenience store operated by Joseph Cho.

Brenda Perreira, the victim's wife, testified she had a dog that would bark if people entered her back yard. The night Louis Perreira was killed, Mrs. Perreira left for church a little after 7:00 p.m. According to Mrs. Perreira, her husband typically was ready for bed by 11:00 p.m. She testified that her husband would lock the doors after she left for church, would watch television in the living room

for a while, then would turn out the house lights and retire to his bedroom to continue watching television.

Mrs. Perreira returned to her residence at approximately 11:30 p.m. As she arrived she noticed that the house lights were on and there were garbage bags on the front lawn, which she said were both unusual. Mrs. Perreira entered the residence and noticed that various possessions of her husband were strewn on the floor, including his guns, and his slippers were in the back hallway. She discovered her husband in the back bedroom on his side. She said he appeared to be dead. She called 911.

Mrs. Perreira confirmed that her husband would purchase cellular phone minutes from a convenience store operated by Joseph Cho. Sometime after her husband was killed, Mrs. Perreira went to Cho's convenience store and informed Cho of what had occurred. Cho told her he could find out which numbers her husband's cellular phone had dialed and which numbers had dialed the phone. Cho printed out the records, which Mrs. Perreira turned over to the police.

Hyoung "Joseph" Cho testified that he owns a cellular telephone store and Mr. Perreira was a frequent customer of prepaid phone cards. He explained that an international mobile equipment identity (IMEI) number is a unique serial number used to identify a particular cellular phone. He further explained that a SIM card is a device used to identify a particular cellular telephone subscriber and that it is possible for a subscriber to remove a SIM card from one phone and place the card in another phone. In that case, any calls or downloads would still appear on the original subscriber's phone records because the records reflect the use of the phone holding the SIM card.

Cho testified that prior to July 18, 2007, Perreira had not used his cellular phone since July 14, 2007. However, a phone containing the victim's SIM card received an incoming call at 11:27 p.m. on July 18. That same phone purchased a ring tone, an answer tone, or a wallpaper for $1.99 several minutes later, made an outgoing call at 11:35 p.m., and purchased a ring tone for $2.49 at 11:36 p.m. At 11:50 p.m. that same phone made a call to a phone identified as belonging to Rickey Taylor.

Mike Haggerty, a security manager with AT & T Corp., verified these phone records.

Rosalind Taylor testified that her son, co-defendant Rickey Taylor, was a friend of the defendant. Rosalind shared a prepaid cellular telephone with her son; however, her son was the primary user of the phone. She acknowledged that, according to the records prepared by Cho, the prepaid phone she shared with her son received several calls from a cellular phone containing Perreira's SIM card in the days and weeks after Perreira's death.

Anastasia Sennette testified that her son, co-defendant Christopher Sennette, was friends with the defendant. She identified the defendant and Christopher from several photographs posted to Christopher's Myspace page.

Rose Brown testified that her son, co-defendant Eric Brown, knew the defendant from the neighborhood. She acknowledged that, according to the records

prepared by Cho, her home phone received several calls from a cellular phone containing Louis Perreira's SIM card in the days and weeks after the victim's death.

Ronnisha Johnson testified that she was dating the defendant at the time of Louis Perreira's death. She admitted she made and received approximately 20 calls to and from a cellular phone containing Louisa Perreira's SIM card between July 18, 2007 and July 22, 2007. She recalled meeting with Barrette and making a statement to him about a .38 caliber revolver. In that statement, Ms. Johnson admitted to Barrette that the defendant placed the revolver in her house. She also admitted that she had seen the defendant with the gun.

Sergeant Rodney Naumann of the Jefferson Parish Sheriff's Office testified he took a buccal swab from the defendant.[FN 6] According to Sergeant Naumann, each buccal swab taken by Jefferson Parish Sheriff's Office personnel is assigned a specific and distinct number. Sergeant Naumann also filled out a chain of custody form for the buccal swab.

> [FN 6] A buccal swab (or buccal smear) is a medical procedure in which a small brush or cotton swab is used to collect a sample of cells and DNA from the inside surface of the cheek.

Bonnie DuBourg of the Jefferson Parish Sherriff's Office, an expert in forensic DNA analysis, compared DNA taken from the chewing gum recovered from Perreira's peephole with that obtained from the defendant's buccal swab. DuBourg was able to recover DNA from the chewing gum and she tested eight genetic markers on that DNA sample. The defendant's DNA matched seven of the eight genetic markers on the DNA recovered from the chewing gum. According to DuBourg, only one in 58 million African-Americans would match seven of the eight markers. DuBourg testified it was not possible for the defendant's DNA to be deposited on the chewing gum after the gum had been removed from the crime scene.

Emily Nick, manager of safety, security, and compliance for Myspace.com, testified that Myspace user number 96164447 was a male individual who identified himself as "Taylor." "Taylor" listed his occupation as "getting money," and the city where he was located as "OVG till I die." Nick additionally testified that Myspace user number 153082201 identified himself as "Chris Sennette" of Marrero, Louisiana. Myspace user number 193092633 identified himself as "Smutty Baby" of Marrero, Louisiana.[FN 7] "Taylor," "Chris Sennette," and "Smutty Baby" were all Myspace friends with each other.

> [FN 7] Several witnesses testified that the defendant's nickname is "Smut" or "Smutty."[24]

---

[24] State v. Wiley, 68 So. 3d 583, 585-88 (La. App. 5th Cir. Apr. 26, 2011); State Rec., Vol. 1 of 5.

The foregoing "old" evidence was obviously compelling evidence of petitioner's guilt, and so he would face a daunting burden to present a credible "actual innocence" claim. Specifically, the United States Supreme Court has explained: "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- *whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence --* that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup v. Delo, 513 U.S. 298, 324 (1995) (emphasis added).

Here, petitioner presents no new evidence of the type or caliber referenced in Schlup. The Court does note, however, that petitioner submitted an affidavit from Eric Brown in connection with the state post-conviction proceedings. In that affidavit, which was executed on February 24, 2014, Brown, who did not testify at petitioner's trial, recanted his statement to the police implicating petitioner. He explained that he falsely implicated petitioner out of fear and in an attempt to keep himself out of trouble.[25] However, if petitioner now attempts to argue that Brown's affidavit is sufficient to establish a colorable "actual innocence" claim under McQuiggin, that argument should be rejected. It is clear that recantations are generally looked upon with the "utmost suspicion," United States v. Smith, 433 F.2d 149, 150 (5th Cir. 1970), and such suspicion is particularly justified here for several reasons.

First, not only is Brown a fellow inmate at the Louisiana State Penitentiary, but he and petitioner have been friends (or at least acquaintances) since before the time of the crime. Brown's status as a prisoner and his preexisting relationship with petitioner renders his affidavit inherently

---

[25] Brown's affidavit can be found in the record at Rec. Doc. 4-5, pp. 19-21.

suspect.  See, e.g., Milton v. Secretary, Department of Corrections, 347 Fed. App'x 528, 531 (11th Cir. 2009) (finding the reliability of petitioner's affidavits suspect because they were executed by friends or fellow inmates); Williams v. Berghuis, Case No. 15-cv10100, 2015 WL 6449331, at *6 (E.D. Mich. Oct. 26, 2015) ("Jailhouse recantations usually lack any meaningful indicia of reliability and are properly regarded as highly suspicious." (quotation marks omitted)).  That is especially true in the instant case in light of the fact that Brown was a co-defendant who had already pleaded guilty and been sentenced with respect to his role in the crime at the time he executed the affidavit.[26]  Therefore, Brown was able to help petitioner, his friend, by providing the affidavit at little or no cost to himself.  In such circumstances, a co-defendant's recantation is obviously of little probative value.  See, e.g., Drew v. Scott, 28 F.3d 460, 463 (5th Cir. 1994) (rejecting actual innocence claim predicated on co-defendant's statements made after he had nothing to lose by exculpating defendant); Gibson v. Vaughn, Civ. Action No. 3:08CV181, 2009 WL 577467, at *3 (E.D. Va. Mar. 5, 2009) ("[R]ecantation testimony, particularly by a codefendant who now has nothing to lose by recanting, is not reliable evidence of innocence."), appeal dismissed, 340 Fed. App'x 172 (4th Cir. 2009).

Second, Brown's affidavit was not executed until February 24, 2014, more than *four years* after petitioner's conviction.  Such a long delay likewise casts doubt on the validity of a recantation.  See, e.g., Olson v. United States, 989 F.2d 229, 232 (7th Cir. 1993) (finding recantation that occurred more than four years after trial to be "dubious"); see also Strayhorn v.

---

[26] State v. Brown, 119 So.3d 761 (La. App. 5th Cir. 2013).  Although the cited opinion does not recount the facts of Brown's case, it is obvious that the opinion concerns the instant crime because the opinion references the same indictment from March 6, 2008, and lists the same docket number (07-6151) for the state district court case.

Booker, 718 F. Supp. 2d 846, 874 (E.D. Mich. 2010) (noting that "[l]ong-delayed affidavits" are "treated with a fair degree of skepticism").

Third, no evidence has been presented which corroborates Brown's assertion that police officers coerced him into implicating petitioner and there is no other evidence of petitioner's purported innocence which could lend a degree of credence to this inherently suspect, long delayed recantation.  See, e.g., Teagle v. Diguglielmo, No. 08-2587, 2009 WL 1941983, *3 (3rd Cir. June 11, 2009) (recantation was suspicious, untrustworthy, and "did not, in the absence of additional corroborating evidence or circumstance, meet the standard of reliability contemplated by Schlup"); Allen v. Woodford, 395 F.3d 979, 994 (9th Cir. 2005) (uncorroborated recantation is "even more unreliable" where original account was consistent with other evidence and recantation was not).

Fourth, there was ample evidence of petitioner's guilt introduced at trial and there is simply no reason to find that the recantation of a single, non-testifying witness is so compelling that no juror, acting reasonably, would have voted to find petitioner guilty beyond a reasonable doubt in light of the recantation.   Therefore, petitioner has not met "the threshold requirement" for McQuiggin to apply.  See McQuiggin, 133 S. Ct. at 1928.  Accordingly, McQuiggin does not aid him.

Because petitioner is not entitled to statutory tolling, and because he has not established that he is eligible for equitable tolling or that the McQuiggin "actual innocence" exception applies, his federal application for habeas corpus relief had to be filed no later than May 29, 2012, in order to be timely.  His application was not filed until on or after April 14, 2016, and, therefore, it is untimely.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Trevon Wiley be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[27]

New Orleans, Louisiana, this seventeenth day of October, 2017.

**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

---

[27] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

16